******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ROBERT CUSHARD
(AC 36680)

Lavine, Beach and Mihalakos, Js.

*Argued November 18, 2015—officially released April 26, 2016*

(Appeal from Superior Court, judicial district of
Litchfield, Ginocchio, J.)

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *David S. Shepack*, state's attorney, and *Dawn Gallo*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Robert Cushard, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree, two counts of robbery in the first degree, and one count of burglary in the first degree pursuant to General Statutes §§ 53a-59 (a) (1), 53a-134 (a) (1) and (3), and 53a-101 (a) (2), respectively. On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress statements that he made during an interrogation by the state police, in that he had smoked crack cocaine a few hours prior to the interrogation and, as such, the waiver of his *Miranda*[1] rights was invalid; (2) granted his motion to represent himself because the court's canvass of him did not adequately establish that his waiver was voluntary, knowing, and intelligent; and (3) instructed the jury that it had to consider his interest in the outcome of the trial, in that such instruction singled him out and thus undermined his right to a fair trial. We do not agree with the defendant's claims, and we affirm the judgment.

The following facts and procedural history are relevant to the disposition of the defendant's appeal. The defendant was arrested in Massachusetts on August 4, 2011. Shortly after his arrest, two Connecticut state police officers interrogated the defendant. During this interrogation, the police prepared a statement for the defendant, but he declined to sign it. A transcript and audiotape of the interview were entered into evidence at the defendant's trial. In July, 2012, the defendant moved to suppress the statements he made during the interrogation, as well as any testimony related to the statements. He argued that he had not knowingly and intelligently waived his rights to counsel and against self-incrimination because he had used crack cocaine shortly prior to his arrest and subsequent interrogation. The court denied the motion.

In September, 2012, the defendant filed a motion to represent himself. The defendant claimed that his attorney, Christopher M. Cosgrove, was not familiar with his case and was ineffective. In October, 2012, the court conducted a canvass of the defendant, at the end of which the court granted his motion to represent himself. In February, 2013, the court recanvassed the defendant "to go over that once again." The defendant indicated, again, that he wished to proceed without counsel.

After hearing the evidence, the jury found the defendant guilty of assault, burglary, and two counts of robbery.[2] The defendant was sentenced to thirty years imprisonment, followed by ten years of special parole. This appeal followed.[3]

I

The defendant claims that the court erred when it denied his motion to suppress the statements he had

made during an interrogation by Brian Narkewicz, a detective with the Connecticut state police. He argues that he did not knowingly and intelligently waive his *Miranda* rights before giving his statements to the police because he had smoked crack cocaine a few hours earlier. We do not agree.

Additional facts, as presented in the record, are necessary to resolve this claim. When the defendant was arrested and brought into the interview room at the police station, Narkewicz read the defendant his rights, and the defendant placed his initials next to each right on a waiver form. The defendant also signed the bottom of the waiver form. Narkewicz testified that the defendant appeared to read the rights form prior to signing. He agreed with the prosecutor that, on the basis of the interview, he believed that the defendant had a sophisticated understanding of the criminal justice system.[4] Narkewicz questioned the defendant about the allegations against the defendant for nearly one hour. He testified that the defendant "was interacting with me in a very coherent and logical manner" and "answering the questions in a logical, calculated manner."

Toward the end of the interrogation, the defendant told Narkewicz that he had used crack cocaine one hour prior to his arrest. In response, Narkewicz terminated the interrogation: "I don't want to take a statement from you when you're [messed] up . . . [and] if you're not in the right frame of mind . . . . [W]e're not going to take a statement from you right now because, you know, you're telling me that you're still messed up on crack cocaine, and I certainly don't want to . . . do anything you're going to regret later on . . . ."

At the hearing on the motion to suppress, Narkewicz testified that, on the basis of his experience and training, he did not believe that the defendant was unable to make rational decisions: "Given the lapse of time between when he was taken into custody and when I was speaking with him, I did not believe that to be a factor during this interview."[5] Narkewicz also testified that the defendant corrected Narkewicz' grammar and pronunciation throughout the investigation. He had not detected the defendant slurring his speech. He observed the defendant exhibit similar mannerisms and speech both during the interview and the next day when the defendant would not have been under the influence of crack cocaine.

The court denied the motion to suppress, and although the court did not make a specific finding as to whether the defendant was under the influence of drugs at the time of the interview, it found in the "totality of the circumstances" that Narkewicz "was a credible witness when he addressed the issue of notice, rights, and waiver of rights. Apparently, [the defendant], according to the testimony, understood those rights, checked off boxes on each right, [and] signed the rights;

he never indicated to Detective Narkewicz, at that point, that there was any issue insofar as cocaine or drug abuse . . . ." The court noted that the defendant had not provided information about any treatment he may have received for drug use or introduced expert testimony to explain the effect an illegal substance may have had on his ability to make a voluntary, knowing, and intelligent waiver.

The defendant argues that the court's conclusion that the waiver was valid was erroneous because it was based on inconsistent findings. He argues that "[t]here is an irreconcilable inconsistency between Narkewicz' testimony and his refusal to take the defendant's statement after he learned that the defendant had smoked crack a few hours earlier. Given the trial court's express reliance on Narkewicz' credibility and reliability, its finding of voluntariness cannot stand."

First, we set forth the principles that guide our review. "To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 50, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "Although the issue [of whether there has been a knowing and voluntary waiver] is . . . ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Stephenson*, 99 Conn. App. 591, 599–600, 915 A.2d 327, cert. denied, 282 Conn. 903, 919 A.2d 1037 (2007).

"Moreover, an express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case . . . [and] in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated. . . . Although mere silence of the accused is not enough to establish waiver . . . the record need not show a specific expression of the relinquishment of rights." (Citations omitted; internal quotation marks omitted.) Id., 600.

We conclude that the court's factual findings were not clearly erroneous or irreconcilably inconsistent and that they survive a scrupulous examination of the

record. See id., 599–600. "The trial court has broad discretion in evaluating the evidence and testimony presented before it." *State* v. *Billie*, 47 Conn. App. 678, 692, 707 A.2d 324 (1998), aff'd, 250 Conn. 172, 738 A.2d 586 (1999). The court credited Narkewicz' testimony that he did not observe, on the basis of his experience and training, the defendant acting incoherently. Rather, the defendant seemed to be composed, articulate, and calculating. Moreover, the record supports the court's finding that the defendant, at the time of the interview, did not indicate that he had used crack cocaine until "things were getting a little too close for comfort with the defendant, in terms of any admissions he might be making . . . ."[6] Although Narkewicz terminated the interrogation upon hearing the defendant's claim that he had used crack cocaine that day, the court reasonably could have determined from Narkewicz' testimony that the defendant was capable of exercising a valid waiver and that Narkewicz simply may have been exercising caution in terminating the interview. On the basis of the record, we conclude that the court did not determine improperly that the defendant validly waived his *Miranda* rights in the totality of the circumstances.

## II

The defendant claims that the court abused its discretion by granting his September, 2012 motion to represent himself because the court did not adequately canvass him pursuant to Practice Book § 44-3, and that such error was structural. We agree that the October, 2012 canvass was inadequate. We disagree that the inadequate canvass amounted to structural error in the circumstances of this case, and instead conclude that it was harmless error.

Practice Book § 44-3 states that a defendant shall be permitted to represent himself at any stage of the proceedings. The rule reads in pertinent part: "A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant: (1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled . . . [and] (3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case . . . ." Practice Book § 44-3. The defendant claims that the court's canvass failed to satisfy the requirements of § 44-3 (1) and (3).

First, we shall address the court's decision to accept the defendant's waiver. Second, we shall conduct a harmless error analysis.

### A

We review a court's decision to permit a defendant to waive counsel and proceed as a self-represented party for abuse of discretion. *State* v. *Davalloo*, 153

Conn. App. 419, 443, 101 A.3d 355 (2014), aff'd, 320 Conn. 123, 128 A.3d 492 (2016). "[W]e do not review the proceedings for strict compliance with the prophylactic rule of Practice Book § 44-3, but rather for evidence that the waiver of counsel was made knowledgeably and voluntarily." Id.

"The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . .

"Practice Book § [44-3] was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . . Before a trial court may accept a defendant's waiver of counsel, it *must* conduct an inquiry in accordance with § [44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. . . . Because the § [44-3] inquiry simultaneously triggers the constitutional right of a defendant to represent himself and enables the waiver of the constitutional right of a defendant to counsel, the provisions of § [44-3] cannot be construed to require anything more than is constitutionally mandated." (Emphasis added; internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 611, 10 A.3d 1005, cert. denied, U.S. , 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

Our Supreme Court recently explained that before a trial court may conclude that a knowing, intelligent, and voluntary waiver of the right to counsel has occurred, it "is required to indulge in every reasonable presumption against waiver of the right to counsel and investigate as long and as thoroughly as the circumstances of the case before [it] demand. . . . [I]t is important that the court consider whether the defendant affirmatively made a choice or whether he proceeded alone only because he felt he had no choice and thus did not effectively waive his right. . . . See, e.g., *State* v. *Mebane*, 204 Conn. 585, 588, 595, 529 A.2d 680 (1987) (reversal required when defendant was prevented from speaking with counsel during recess in midst of state's cross-examination), cert. denied, 484 U.S. 1046, 108 S. Ct. 784, 98 L. Ed. 2d 870 (1988); see also *State* v. *Brown*, 279 Conn. 493, 507 n.5, 903 A.2d 169 (2006); *State* v. *Peeler*, 265 Conn. 460, 475, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004)." (Citations omitted; internal quotation marks omitted.) *State* v. *Francis*, 317 Conn. 450, 459–60, 118 A.3d 529 (2015).

With these foundational principles in mind, we turn to the present case. The defendant argues that the October, 2012 canvass did not satisfy the requirements of Practice Book § 44-3 in two respects: the canvass established neither that he knew that he had the right to the assistance of counsel, nor that he comprehended the nature of the charges and range of possible punishments. See Practice Book § 44-3 (1) and (3). The record supports the defendant's position. The following colloquy occurred, in relevant part, at the October, 2012 canvass:

"The Court: . . . You're facing assault one, robbery one, larceny fourth. And I'm just going to ask the state's attorney to put on the record—if you did proceed to trial. Attorney [Dawn] Gallo, what would he be tried on? What type—what charges?

"[The Prosecutor]: The state would actually try the matter at firm jury line two first, which is assault first, robbery one, and larceny four, Your Honor. And the violation of probation was based in part on that new arrest, so that could be tried concurrently to the court at the same time. The assault one is a twenty year felony; the robbery one is a twenty year felony; the larceny is a misdemeanor case; and on his violation of probation, Your Honor, he owes just one year on an interfering with a police officer.

"Additionally, however, the state may charge a burglary one, which is also a twenty year felony, so at this point [the defendant's] maximum exposure is sixty plus years on those files.

"The Defendant: How do you get sixty? They don't—they don't even add up.

"The Court: But see, that's one of the questions I would ask you. Did you realize that if you proceeded to trial and you lost, your exposure could be twenty years on the assault one.

"The Defendant: Right.

"The Court: Twenty years on the robbery.

"The Defendant: There's no sixty.

"The Court: That's forty.

"The Defendant: There's no sixty that remotely even—that's wrong.

"The Court: Right now I have forty. Would you just repeat that again?

"[The Prosecutor]: Right, Your Honor. This was an entry into a building with the intent to commit a crime; the state has the right to add a burglary one charge. I've discussed that with Attorney Cosgrove in the scope of our negotiations. At the time that the offer was rejected, all those negotiations went out the window. So, at this point the state is considering adding a bur-

glary one charge as well.

"The Court: All right. Whether you agree with that or not your exposure—

"The Defendant: Right.

"The Court: Your exposure—

"The Defendant: So, basically that's a threat if I don't cop out—

"The Court: Well—

"The Defendant: —I'm going to have this charge in a way.

"The Court: All I know is that the state has the right— if there's no negotiations reached, the state's entitled—

"The Defendant: Right.

"The Court: —to proceed—

"The Defendant: Right.

"The Court: —on the charge—but the question I have for you is, do you realize what your exposure is?

"The Defendant: I mean, I mean, well, now I do, you know, but I mean, that's kind of crappy, she's going to threaten me like that, but . . . .

"The Court: It's not a threat, it's basically—

"The Defendant: I mean, I can't do no worse. Mr. Cosgrove, when was the last time you—won a case in this courtroom? It's been years, right? He's been—I mean, I can't do any worse than that. . . .

"The Court: And you know that you have the right to have Mr. Cosgrove continue to represent you. If you went through with your trial, he would be there; he'd be able to file motions before or during the trial; he would be able to cross-examine or confront witnesses brought in against you; he would be able to advise you or you'd be able to help him during jury selection in choosing a jury that you both felt was acceptable. . . .

"The Defendant: I could plead my case today and walk out of here. I mean, it's really simple. I mean—

"The Court: All right. You understand that you could have a lawyer represent you, it would be Mr. Cosgrove. You don't want—you do not want him to represent you, correct?

"The Defendant: Right."

First, we address the defendant's contention that the canvass failed to ensure that he had been advised of his right to an attorney. Although a court is not required to read a "formula or script" in its determination of whether a defendant made a voluntary, intelligent, and knowing waiver; see *State* v. *Wilkins*, 159 Conn. App. 443, 450, 123 A.3d 92, cert. denied, 319 Conn. 935, 125 A.3d 208 (2015); the court in this matter did not inquire

as to whether the defendant had been advised of his right to an attorney or of his right to hire a private attorney at the October, 2012 canvass. Indeed, the words of the court, read literally, suggested that the defendant had only two choices: to proceed without representation or to proceed with representation by Cosgrove. There was no advisement during the canvass that the defendant had the general right to counsel of his choice, with the proviso that, if he could not afford counsel, the court was not inclined to appoint counsel other than Cosgrove.

Our Supreme Court has held that "[a] defendant . . . does not possess a constitutional right to a specifically formulated canvass . . . . His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish that the defendant's waiver was voluntary and knowing." (Internal quotation marks omitted.) *State* v. *Diaz*, 274 Conn. 818, 831, 878 A.2d 1078 (2005). The state argues that the record sufficiently supports the court's conclusion that the defendant's waiver was voluntary, knowing, and intelligent; specifically, the state claims that the defendant previously had been advised of his right to counsel by Cosgrove, and by statements made at his arraignment, such that the court properly could accept his waiver of counsel.

The state posits that Cosgrove clearly advised the defendant of his right to an attorney in letters written by Cosgrove to the defendant. The defendant attached to his motion to allow self-representation two letters from Cosgrove. Cosgrove's May, 2012 letter stated, "You can always hire a private attorney, if you can afford one, or you could ask the judge to allow you to represent yourself, if that's what you want. He is not going to appoint you another public defender." These two sentences do not establish that the defendant, as the state argues, was "clearly advised of the right to the assistance of counsel . . . ." Practice Book § 44-3 (1). There is no evidence in the record that the defendant read Cosgrove's May, 2012 letter, nor did the court inquire as to whether the defendant understood, on the basis of the statements in that letter, that he had the right to counsel. Whether the defendant, in fact, had been advised or was aware that he had such a right was not established during the canvass; hence, the canvass did not comport with § 44-3 (1).[7]

Second, we address the defendant's claim that the canvass did not establish that he comprehended the nature of the charges against him. The state contends that the court could infer that Cosgrove had advised the defendant as to the nature of the charges against him: "Because Cosgrove provided the defendant discovery documents, engaged in plea negotiations, and communicated with the defendant, in writing and in person, even when the defendant stubbornly refused to recipro-

cate, it is appropriate to presume that he informed the defendant of the nature of the charges." Our case law does not support the contention that such a presumption was proper in this particular case.

In *State* v. *Frye*, 224 Conn. 253, 617 A.2d 1382 (1992), our Supreme Court acknowledged that "a trial court may generally presume that defense counsel has explained to a defendant the nature of the offense . . . ." (Citation omitted.) Id., 261–62. The presumption did not apply in *Frye* itself, however, because "the defendant felt 'unsatisfied with [his attorney's] level of preparation and knowledge about the case.' Moreover, the defendant informed the court that 'I haven't talked to [the appointed attorney] no more than [twenty] minutes at the most.' " Id. Similarly, in the present matter, the defendant stated during the October, 2012 canvass that he and Cosgrove "have not discussed my case in a year, I mean, at all." Cosgrove's letters also reflect that he and the defendant had not discussed details about the case. Cosgrove wrote, "I told you I am not going to put a case on the trial list until I am ready. That means knowing what possible defenses I have, and knowing that my client is ready, willing and able to work with me. As you have told me in the past, and as you put in your letter, you will not talk to me about the case until 'after we get a trial date.' "

Given the nature of the working relationship, or lack thereof, between the defendant and Cosgrove, as illuminated by the defendant's statements in court and Cosgrove's letters, we do not presume that Cosgrove adequately informed the defendant of the nature of the charges. As our Supreme Court held in *Frye*, we conclude that the court should have "delve[d] more deeply into the question of whether the defendant had sufficient understanding of the nature and complexity of the charges against him to have the capacity to make an intelligent waiver of his right to counsel." *State* v. *Frye*, supra, 224 Conn. 262.

The state also asserts that the defendant "specifically" was informed both of his right to counsel and of the nature of the charges against him at his arraignment. The arraignment occurred on August 5, 2011, which was more than one year prior to the October, 2012 canvass. At arraignment, the court instructed the defendant that he had the right to an attorney.[8] Later in that proceeding, the state provided the factual basis for the charges.[9] We disagree with the state's argument that the statements made at the arraignment served to adequately inform the defendant of his right to counsel and of the nature of the charges against him such that the court, at the October, 2012 hearing, properly could conclude, at least in the unusual circumstances of this case, that the defendant, at the time of the canvass, was sufficiently aware of his right to counsel and that he comprehended the nature of the charges against him.

On August 5, 2011, a court reasonably might have concluded that the defendant had been clearly advised of his right to counsel and that he comprehended the nature of the charges against him. The October, 2012 canvass, however, occurred more than one year later. In addition to the lack of temporal proximity between these two events, the defendant's competence was called into question between the times of the arraignment and the canvass. On January 4, 2012, the court was presented with evidence that a psychiatric evaluation team had found the defendant to be incompetent to stand trial. On April 5, 2012, the court, relying on a report issued by the psychiatric institution overseeing the defendant's treatment, determined that the defendant's competency had been restored. Even though the defendant may have been competent during arraignment, we are not persuaded by the state's contention that the defendant necessarily should have been found to understand his rights and that he understood the charges against him at the October, 2012 proceeding because of statements made in the defendant's presence more than one year earlier—a year in which the defendant had been deemed incompetent to stand trial and had received extensive treatment for psychiatric issues.

*State* v. *Woods*, 158 Conn. App. 231, 118 A.3d 691 (2015), presents an analogous set of facts. In that case, the defendant claimed that the court improperly accepted his waiver of counsel without establishing, through the record or a proper canvass, that he understood the range of permissible punishments to which he could be subjected. The defendant, who had been released on probation, had failed to timely report to the Office of Adult Probation. He was arrested and a violation of probation hearing was scheduled. The case was continued multiple times. At the hearing, the defendant requested that he be permitted to represent himself. During the court's canvass,[10] the defendant indicated that he did not understand the nature of the violation of probation charge. Nonetheless, the court allowed the defendant to represent himself. After the hearing, the defendant's probation was revoked. On appeal, the defendant claimed that the court had abused its discretion when it permitted him to waive counsel without establishing that his waiver was made knowingly and intelligently because he had not understood the range of permissible punishments to which he was exposed. Id., 233–38.

The state in *Woods* argued that the defendant had been informed of the range of possible punishments that he faced from statements the court had made prior to the defendant's waiver of counsel. This court concluded, however, that the canvass "was not a thorough inquiry sufficient to inform the defendant of his rights prior to waiver." Id., 243. In one of its arguments, the state noted that the defendant had reviewed and signed

a probation form that notified him of the possible range of punishments he faced if he violated his probation. This court determined that the evidence that the defendant signed the form did not establish that the defendant "was aware of this information when he later chose to waive counsel. . . . [M]ore than five and one-half months had passed between the time he signed the probation form and the time he waived his right to counsel. Accordingly, the probation form itself does not establish that the defendant was aware of the possible penalties he faced *at the time of the hearing*. . . . As we are required to make every reasonable presumption against waiver of fundamental constitutional rights . . . we cannot presume that the defendant understood the penalty for violating probation on the basis of a form he had reviewed and signed nearly six months prior to waiving counsel." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 246.

The present case, in which informative statements were made to the defendant more than one year before the waiver canvass—a year in which the defendant had been declared incompetent—is analogous to *Woods*. The state's argument that the arraignment satisfied the requirements of Practice Book § 44-3, then, is not persuasive. In similar fashion, the state also argues that the defendant's arrest warrant detailed the factual allegations against the defendant. The arrest warrant does not satisfy the requirements of § 44-3 because, like the statements made at the arraignment that were insufficient to show knowledge at the time of the canvass, the arrest warrant was executed and issued too far in the past to be considered a clear advisement of the right to counsel at the October, 2012 hearing. The October, 2012 canvass was, therefore, inadequate to establish that the defendant understood the nature of the right to counsel and of the charges against him at the time the court accepted the waiver.

### B

We next consider whether the court's acceptance of the waiver amounted to structural error, which cannot be deemed harmless, as the defendant claims, or whether it was harmless error, as the state claims. We are persuaded by the state. Although some inadequate waivers of the right to counsel are not subject to harmless error analysis, the unusual facts of this case lead to an inescapable conclusion of harmlessness.

In his brief, the defendant claims that the inadequate canvass constituted structural error and therefore was "per se harmful," notwithstanding the occurrence of the subsequent February, 2013 canvass. The state contends that harmless error analysis is appropriate. It argues that any error in the initial canvass was cured by the subsequent February, 2013 canvass, and that nothing of any significance happened in the four months between the two canvasses.

"Since *Chapman* v. *California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), the United States Supreme Court has repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. . . . Despite the strong interests that support the harmless-error doctrine, the [c]ourt in *Chapman* recognized that some constitutional errors require reversal without regard to the evidence in the particular case. . . . Errors that are not subject to harmless error analysis go to the fundamental fairness of the trial. . . . Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair. . . .

"This court has found error to be structural only when the error renders a trial fundamentally unfair and is not susceptible to a harmless error analysis . . . . For example, in *State* v. *Peeler*, 265 Conn. 460, 475–76, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004), we concluded that the improper denial of the defendant's constitutional right to counsel of choice during the trial was not subject to harmless error review because it constituted a fundamental component of the sixth amendment right to a fair trial. In *State* v. *Murray*, 254 Conn. 472, 499, 757 A.2d 578 (2000), we concluded that the improper substitution of an alternate juror after deliberations had commenced constituted structural error because of [t]he inability to assess the effect of this impropriety on the defendant's trial . . . . In most cases involving constitutional violations, however, this court applies harmless error analysis. See, e.g., *State* v. *Carpenter*, 275 Conn. 785, 832–33, 882 A.2d 604 (2005) (admission of statements in violation of constitutional right to confrontation was harmless error), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006); *State* v. *Padua*, 273 Conn. 138, 166–67, 869 A.2d 192 (2005) (although improper jury instruction violated due process rights, error harmless); *State* v. *Montgomery*, 254 Conn. 694, 715–18, 759 A.2d 995 (2000) (admission of evidence concerning defendant's silence . . . harmless error despite violation of due process rights)." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 279 Conn. 504–506.

A review of case law reveals that sixth amendment deprivations may, in some instances, be susceptible to harmless error analysis. In *State* v. *Brown*, supra, 279 Conn. 493, a probable cause hearing was conducted in

which the defendant was not represented by counsel. The state agreed that constitutional error resulted. Our Supreme Court held, however, that the subsequent conviction was not invalid as a result of the deprivation of counsel because the deprivation did not render the subsequent trial fundamentally unfair and it was susceptible to harmless error analysis. Id., 509–11. The defendant's counsel obtained a transcript of the proceeding for use at trial, the defendant was not prejudiced by his inability to cross-examine a state's witness at the hearing,[11] and there was no showing of an inability of counsel to prepare for the subsequent trial. Id., 512–13. Similarly, in *State* v. *Anderson*, 255 Conn. 425, 444–48, 773 A.2d 287 (2001), our Supreme Court held that the introduction of extrinsic evidence to the jury room does not evade harmless error review.[12] Our Supreme Court has found error to be structural only when the error "renders a trial fundamentally unfair and is not susceptible to a harmless error analysis . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Latour*, 276 Conn. 399, 411, 886 A.2d 404 (2005). The inadequate canvass in the circumstances of the present case is the type of error that properly may be subject to harmless error analysis.[13]

The defendant claims that during the four month period between his two canvasses, a "hypothetical attorney might have filed unfiled motions, found unfound witnesses, obtained unobtained discovery, challenged unchallenged evidence, asked unasked questions, raised unraised defenses, and so on." Notwithstanding the actions a "hypothetical attorney" might have taken, the defendant does not identify specific and unremediable harm that he suffered between the two canvasses as a result of his not having counsel.[14] The second canvass had the effect of affirming the decision made by the defendant in the first canvass; the defendant's intent to waive his right to counsel and proceed to trial without the assistance of an attorney thus is clearly established by the record before us.

The adequacy of the February, 2013 canvass is not disputed by the defendant. For example, the court clearly conformed this canvass to the requirements of Practice Book § 44-3 (1). When the court advised the defendant that "you do have a right to have a lawyer represent you," the defendant responded, "I know that." The court further explained: "And if you wanted a lawyer to represent you and you could not afford an attorney, I would make a public defender available to you." In response to the canvass questions, the defendant repeatedly assured the court that he wanted to proceed without a lawyer.[15] Though the court explained the drawbacks of electing to proceed without counsel, the defendant affirmatively asserted his right to represent himself, as he did in the October, 2012 canvass. At both canvasses, then, the defendant asserted his right to represent himself. The court did not infringe upon that

right or prevent him from exercising that right. The record shows that the defendant, during the thorough February, 2013 canvass, knowingly and intelligently waived his right prior to trial.

Any prejudice that the defendant possibly could have suffered in the presentation of his defense as a result of the inadequate October, 2012 canvass has not been identified, even categorically, and does not render the proceedings so fundamentally unfair as to constitute one of the "rare exceptions to the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Brown*, supra, 279 Conn. 511. On the facts established by this record, we determine that the infirmity in the first canvass was harmless error.

We conclude, then, that (1) there is no claim of specific harm; (2) the defendant functionally ratified his first decision in the second canvass; and (3) there is no suggestion that, had harm in some way occurred, it could not have been corrected. There was no fundamental unfairness, and the claims are susceptible to harmless error analysis.

III

Finally, we address the defendant's claim that the court improperly charged the jury on the credibility of witnesses by indicating that the defendant's interest in the outcome of the case had to be considered in evaluating his testimony. The defendant claims that this instruction undermined the presumption of innocence, and his right to a fair trial and to testify in his own defense. We disagree.

We review the defendant's claim of instructional impropriety pursuant to the following standard of review. "The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 623, 65 A.3d 503 (2013).

In the present case, the court instructed the jury as to the credibility of witnesses as follows: "You may

believe all, none, or part of any [witness'] testimony. In making that decision, you may take into account a number of factors, including: (1) Was the witness able to see, or hear, or know the things about that witness testified?; (2) How well was the witness able to recall and describe those things?; (3) What was the [witness'] manner while testifying?; (4) Did the witness have a motive or an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case?; (5) How reasonable was the [witness'] testimony considered in light of all of the evidence in the case?; (6) Was the [witness'] testimony contradicted by what that witness has said or done at another time, or by the testimony of other witnesses or by other evidence?"

As to the defendant's testimony, the court instructed the jury: "In this case, the defendant testified. And [an] accused person having taken the [witness] stand, stands before you just like any other witness. He is entitled to the same consideration and must have his testimony tested and measured by you, by the same factors and standards as you would judge the testimony of any other witness. *That necessarily involves a consideration of his interest in the verdict that you will render. You will consider the importance to him of the outcome of the trial.* You have no right to disregard his testimony or to disbelieve his testimony merely because he is accused of a crime. You will consider my earlier instructions on the general subject matter of credibility that obviously pertain to the defendant's testimony as well as the testimony of any other witness." (Emphasis added.)

The defendant claims that two sentences in the court's instruction regarding the defendant's interest in the case improperly "singled out the defendant and undermined his rights to a fair trial and to testify in his own defense, and interfered with the jury's prerogative to decide credibility . . . ." These sentences read: "That necessarily involves a consideration of his interest in the verdict that you will render. You will consider the importance to him of the outcome of the trial." The defendant relies on *State* v. *Medrano*, supra, 308 Conn. 604, which was decided by our Supreme Court two months after the conclusion of the defendant's trial in this case. This reliance is misplaced.

In *Medrano*, the Supreme Court upheld a challenged jury instruction which contained similar language to that which is involved in the present matter: "In weighing the testimony of an accused person, you should apply the same principles by which the testimony of other witnesses is tested. And that necessarily involves a consideration of [the defendant's] interest in the outcome of the case. You *may* consider the importance to him of the outcome of the trial." (Emphasis added; internal quotation marks omitted.) Id., 624.

Despite the defendant's claim that this instruction singled him out from other witnesses, the Supreme Court concluded that the instruction "was not unduly repetitive, nor did it transcend the bounds of evenhandedness." Id., 626. Nevertheless, the court, in an exercise of its supervisory power, "direct[ed] our trial courts in the future to refrain from instructing jurors, when a defendant testifies, that they may specifically consider the defendant's interest in the outcome of the case and the importance to him of the outcome of the trial. Instead, we instruct the trial courts to use the general credibility instruction to apply to a criminal defendant who testifies." Id.

The defendant urges us to distinguish the *Medrano* instruction because that instruction employed "permissive language"—"may"—whereas the present instruction used "mandatory language"—"will." Although the defendant asserts that *Medrano*'s holding rests on the instruction's use of permissive language as opposed to mandatory language, there is no reference to or explanation of such a distinction within the decision in that case. The stated reason for exercising supervisory authority in *Medrano* was not a parsing of the language, but rather the specific singling out of the defendant for scrutiny. Moreover, as the defendant correctly points out in his brief, Connecticut courts ordinarily have not addressed the mandatory/permissive distinction in the context of jury instructions. Cf. *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002) (directing future trial court "to refrain from instructing jurors that one who uses a deadly weapon on the vital part of another 'will be deemed to have intended' the probable result of that act and that from such a circumstance the intent to kill properly may be inferred"). Finally, the Supreme Court in *Medrano* explicitly limited its exercise of supervisory power to "trial courts in the future . . . ." *State* v. *Medrano*, supra, 308 Conn. 631. Nothing in that decision suggests that its directive, to refrain from specifically inviting jurors to consider the defendant's interest in the outcome of the trial, was to be retroactively applied. The court's use of its supervisory powers in *Medrano*, then, does not apply to the present case, which concluded two months prior to the Supreme Court's decision in *Medrano*.

In a case cited in *Medrano*, *State* v. *Williams*, 220 Conn. 385, 397, 599 A.2d 1053 (1991), our Supreme Court upheld jury instructions similar to those at issue in the present case. In *Williams*, the trial court emphasized the defendant's interest in the outcome of the trial on three separate occasions, which, the defendant argued, rendered the instructions less than evenhanded. Our Supreme Court disagreed because "[i]n each instance the trial court prefaced its remarks concerning the defendant's interest in the outcome with comments such as: (1) [y]ou should apply the same principles by which the testimony of other witnesses are tested; (2)

the accused is entitled to the same consideration and must have his testimony measured in the same way as any other witness . . . and (3) you should apply the same test to it as you did with the other witnesses . . . ." (Internal quotation marks omitted.) Id. The instructions continually emphasized, despite the challenged language, that "the jury was to evaluate the defendant's testimony in the same fashion as the testimony of the other witnesses." Id.

Similarly, in the present case, the two sentences charging the jury to consider the defendant's interest in the outcome of the trial were preceded and followed by caveats: "[The defendant] is entitled to the same consideration and must have his testimony tested and measured by you, by the same factors and standards as you would judge the testimony of any other witness"; "You have no right to disregard his testimony . . . . You will consider my earlier instructions on the general subject matter of credibility that obviously pertain to the defendant's testimony as well as the testimony of any other witness." Like our Supreme Court in *Williams*, we conclude that, considered in the context of the jury charge as a whole, particularly in light of the mitigating language surrounding the challenged instruction, the statements addressing the defendant's interest in the outcome of the trial did not violate constitutionally protected rights. Although overtly permissive language may have been preferable, we do not view the instructions as a whole to have been unfair or unbalanced.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] The defendant was acquitted of one count of burglary in the first degree, pursuant to § 53a-101 (a) (1).

[3] We note, in reference to the second and third claims in this appeal, that the defendant did not argue to the trial court that the October, 2012 canvass violated his constitutional right to counsel and that he did not take an exception to the instruction at issue or otherwise preserve his claims for appellate review. The defendant raised his constitutional arguments for the first time in his appellate brief. It is a "bedrock principle of appellate jurisprudence that [reviewing courts] generally will not review unpreserved claims made for the first time on appeal." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 743, 91 A.3d 862 (2014). "In *Elson*, [however] our Supreme Court further stated, '[w]e conclude, therefore, that to obtain review of an unpreserved claim pursuant to *State* v. *Golding*, [213 Conn. 233, 239–40, 567 A.2d 823 (1989)], a defendant need only raise that claim in his main brief, wherein he must present a record that is [adequate] for review and affirmatively [demonstrate] that his claim is indeed a violation of a fundamental constitutional right.' . . . *State* v. *Elson*, supra, 754–55." *State* v. *Place*, 153 Conn. App. 165, 171 n.6, 100 A.3d 941, cert. denied, 314 Conn. 946, 103 A.3d 977 (2014). Accordingly, we conclude that the defendant's brief satisfies the test set forth in *Elson*, and therefore we will review the two unpreserved claims.

[4] For example, Narkewicz testified that "[the defendant] quite correctly stated that extradition on a misdemeanor, violation of probation warrant, was out of the norm. That it could not be effected when he was across state lines."

[5] Narkewicz testified that the defendant would have used crack cocaine at about 2 p.m., if he used it one hour before his arrest. The waiver occurred

at 4:20 p.m.

[6] A suspect ought not be entitled unreservedly to "take back" admissions and render them inadmissible by later stating he had been using drugs at the time of his waiver. In this case, there was no finding that the defendant actually had used drugs shortly before the interview.

[7] We note that the record indicates that the arraignment occurred on August 5, 2011, and Cosgrove's letter was dated May 24, 2012. The canvass in issue occurred on October 10, 2012, some four and one-half months later. Further, the record indicates that on June 12, 2012, Cosgrove sent a second letter to the defendant; this letter informed the defendant that he could "ask the judge to let you represent yourself, if you insist on not talking to me, and he might even allow it." In any event, the record does not show that the defendant was aware of the general right to counsel at the time of the canvass.

[8] The court stated: "Now, you have the right to an attorney. If you want to hire your own attorney, I will give you a reasonable continuance for that purpose. If you want to apply for the public defender, you may do so, and then the public defender would decide whether or not they would be appointed in your case."

[9] The prosecutor stated: "[The defendant] took a pipe wrench and slammed it into the head of the store owner, who is a friend, causing the man to have a brain bleed. So, he had a laceration in the back of his head, bled from the front of the brain, was airlifted to Hartford Hospital, lost hearing, and they're awaiting to see if there's other permanent damage based upon the brain injury. He stole money, fled from the scene, as I stated, and was found in Massachusetts."

[10] The court and the defendant in *Woods* engaged, in relevant part, in the follow colloquy:

"The Court: . . . And did you understand the nature of the charges here, the [violation of probation] and what it's all about?

"[The Defendant]: Not really, Your Honor.

"The Court: You don't understand—

"[The Defendant]: Not really, I really don't.

"The Court: You don't understand the violation of probation? You've had them before in your past.

"[The Defendant]: No. I've never been on probation before in my life.

"The Court: So you don't understand what a violation of probation is? This might mean I'm going to have to keep your lawyer in.

"[The Defendant]: I don't—no, I really don't.

"The Court: Well, I just read to you the two allegations that they're talking about here about reporting, about your address and so forth and so on. You don't—do you understand that? They're saying that's a violation of probation.

"[The Defendant]: Yes, Your Honor, but the problem is that I can't prove—I can't prove that I didn't violate the probation hearing without calling in. The guy who talked to me at the conference—video conference, because I told him specifically that I didn't have anywhere to stay, so—

"The Court: Okay. This—no, don't—don't get lost here. I'm just talking about do you understand the nature of the charges against you, it's violation of probation. You got it?

"[The Defendant]: Yeah. I have a violation of probation, but the dispute—

"The Court: That's all—that's all I'm asking—okay." (Internal quotation marks omitted.) *State* v. *Woods*, supra, 158 Conn. App. 236 n.1.

[11] Significantly, for the purpose of the present case, the court in *Brown* suggested that any prejudice arising from the inability of counsel to cross-examine was never *specifically* identified. See *State* v. *Brown*, supra, 279 Conn. 512. Similarly, in this case, the defendant specifically identifies no harm at all.

[12] By contrast, if anything occurs in a critical stage of a trial that cannot later be ameliorated, is conducted in violation of sixth amendment rights, and is considered fundamentally unfair, then the error is not subject to harmless error analysis and is therefore labeled structural. See *State* v. *Jordan*, 305 Conn. 1, 23, 44 A.3d 794 (2012); *State* v. *Braswell*, 145 Conn. App. 617, 636, 76 A.3d 231 (2013), aff'd, 318 Conn. 815, 123 A.3d 835 (2015); *State* v. *Cohens*, 62 Conn. App. 345, 352, 773 A.2d 363, cert. denied, 256 Conn. 918, 774 A.2d 139 (2001).

[13] Were we to adopt the defendant's argument that an inadequate canvass necessarily and without exception constitutes structural error, we would create an unworkable precedent. For example, if a court inadequately canvassed a defendant during a pretrial hearing but realized the following day that the canvass had not conformed to Practice Book § 44-3 and conducted

a new, valid canvass, the court would be deemed to have committed fatal structural error. According to the defendant, the remedy for such an error is a new trial. Yet, in our hypothetical example, there has been no trial and, pursuant to the defendant's argument, the inadequate canvass was not remedied by the subsequent, adequate canvass. The trial court, then, in this hypothetical example, would not be able to allow the case to continue to trial because the trial would have been contaminated by the structural error, nor could the court cure its earlier error. The defendant's argument essentially asks this court to eliminate any ability of the trial court to correct an inadvertent error with a logical and timely remedy.

We note that in the case before us the remedy sought also is illogical. The defendant seeks, on appeal, the remedy of a new trial. The defendant, however, already has had a trial after a waiver of counsel that concededly was adequate.

[14] The court did consider several matters in the four month gap between canvasses. There has been no suggestion that anything harmful occurred during that time.

[15] The defendant stated: "Yeah, I'm good, I got it"; "Yeah, I'm familiar with everything"; "I'm—I checked it out. I got it"; "I don't think I need [standby counsel]." At one point in the canvass, the defendant told the court, "You're turning this into something that is bigger than what it is."

---